## IGLEHEART et al. v. COMMISSIONER OF INTERNAL REVENUE.*

No. 7389.

Circuit Court of Appeals, Fifth Circuit.

May 21, 1935.

John E. McClure, of Washington, D. C., for petitioners.

Frank J. Wideman, Asst. Atty. Gen., John MacC. Hudson, J. Louis Monarch,

and Sewall Key, Sp. Assts. to Atty. Gen., and Robert H. Jackson, Asst. Gen. Counsel, Bureau of Internal Revenue, and Frank T. Horner, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before BRYAN, SIBLEY, and WALKER, Circuit Judges.

WALKER, Circuit Judge.

By petition for review the executrix and executor of the estate of Addison W. Igleheart, deceased, complain of the action of the Board of Tax Appeals under a petition for a redetermination of a deficiency of estate taxes assessed by the respondent against the estate of the decedent, who died on December 24, 1927.

On June 1, 1926, the decedent, then 74 years of age, the date of his birth being March 6, 1852, created two trusts, and executed his will, which superseded a will made in 1921, whereby, after a specific bequest to his wife, he gave the residue of his estate in equal shares to his wife and his four children; the will naming his wife as executrix and his son executor. One of the trusts was created by an instrument whereby the decedent transferred irrevocably to his wife corporate stock and bonds, including Federal Land Bank bonds, the property transferred then having a value of $498,599.-88, in trust to receive for herself the net income during her life, upon her death the trust fund to be divided equally between the decedent's surviving children; the share of any deceased child of the decedent to go to that child's surviving issue. The other trust was created by an instrument whereby the decedent transferred to a named trust company described corporate stock, then having the value of $869,122.28, in trust to pay the net income of the trust property to the decedent during his natural life, and, upon the death of the decedent, the trust property to be divided equally between the decedent's children; the share of any deceased child of the decedent to go to that child's surviving issue. The decedent expressly reserved the right at any time during his lifetime to revoke, annul, or amend the trust created by that instrument. In February, 1926, Igleheart Bros., an Indiana corporation, of which decedent was a stockholder and officer, sold to the decedent for the cash surrender value thereof certain policies of insurance on the decedent's life which that corporation, prior to 1920, had taken out for its own benefit; the several applications therefor having been signed by the decedent. Pursuant to provisions contained in each of the policies the decedent caused the name of the beneficiary to be changed from that of the corporation to a named beneficiary other than the estate of the decedent, under the policies the decedent having the right further to change the beneficiaries. Upon the death of the decedent, $112,446.00 was paid under the policies to the designated beneficiaries chosen by the decedent. In August, 1927, the decedent took out a two-year endowment policy of $100,000 on the life of his wife, paying therefor a single premium of $97,-225.

The estate tax deficiency in question, in so far as it was approved by the Board of Tax Appeals, resulted from adding to the amount shown by petitioners' return as subject to estate tax the following: The amount of the value at the date of the decedent's death of the property included in the trust created by him in favor of his wife primarily, the value of that property at that time being substantially greater than it was at the time that trust was created; the amount of the value at the date of the decedent's death of the property included in the trust created by the decedent in his own favor for life, that value being substantially greater than the value of such property at the time that trust was created; (in calculating the value or the amounts of property transferred by the decedent in creating the two trusts, an exemption of $5,000 was allowed for each of five beneficiaries) the amount collected on policies of insurance on the life of the decedent bought by the decedent from Igleheart Bros. of Indiana, less the statutory exemption of $40,000; the amount of the cash surrender value at the date of the decedent's death of the two-year endowment policy on the life of decedent's wife, and the amount of the value at the time of decedent's death of Farm Loan bonds held by the decedent and in trust in his favor; and from the disallowance of a deduction of $1,500, the amount of an obligation incurred by decedent's estate for the perpetual care and maintenance of a mausoleum and cemetery lot for the last resting place of the decedent.

From his boyhood until April, 1926, when all of the stock of Igleheart Bros. of Indiana was sold, the decedent was connected with the business of that corporation; that business being a flour milling business which was established by the father of the decedent. In the earlier years the decedent was a clerk and salesman, and from 1905 to April 1, 1926, he was vice president and treasurer. The decedent and his two brothers each had one son. The decedent and his two brothers each owned two-ninths of the common and preferred stock of Igleheart Bros., and each of the sons owned one-ninth thereof. Following negotiations, on April 1, 1926, after the preferred stock, having a par value of $810,000, had been retired, all the common stock of that corporation was sold to the Postum Company for $595,000 cash and 95,000 shares of Postum Company stock; the liquid assets of the corporation consisting of cash and securities being distributed pro rata to the stockholders at the same time. Contemporaneously there was organized a Delaware corporation, called Igleheart Bros., Inc., which received the 95,000 shares of the Postum Company stock and in exchange therefor delivered to the former stockholders of Igleheart Bros. of Indiana its own class A stock in proportion to their respective interests. As a result of the retirement of the preferred stock of Igleheart Bros. of Indiana and the sale of the common stock to the Postum Company, the decedent acquired cash and stock amounting in value to $2,424,000. Before these transactions his net worth, excluding his interest in Igleheart Bros. of Indiana, was approximately $100,000, and after the sale of the common stock of Igleheart Bros. of Indiana to the Postum Company, the decedent was possessed of independent means in excess of $2,500,000.

In November, 1915, the decedent suffered a stroke described as a right-side hemiplegia, a condition brought about by the rupture of a blood vessel in the left side of the brain which might result from any one of a number of causes, such as thickening or hardening of the arteries, embolism, stomach disease, nephritis, and other causes. Medical examination of the decedent after the stroke failed to disclose the cause. His urine was normal; there was no heart trouble and he had no kidney disease. Decedent was confined to his bed about four weeks and then regained normal health, except that the use of his right arm and leg was seriously impaired from the time of the stroke to his death. His mind, speech, hearing, and eyesight remained normal until his death, but because of lack of use of the right arm he learned to write with his left hand. Until three days before his death the decedent had general good health, his appetite remained normal, and he was not attended by a physician except on two or three occasions for minor ailments unrelated to the hemiplegia. After the stroke the decedent could and did walk short distances about his house with assistance and the help of a cane, but for the most part he spent his time sitting in a chair in the house or on the veranda reading or talking with his family, friends, or business associates. In good weather he took some trips of several hundred miles. The decedent remained cheerful and optimistic to the end, was never morose, but always of a sociable nature with a sense of humor, and did not talk about the condition of his right leg and arm.

After the stroke in 1915 the decedent did not go to his office but continued as vice president and treasurer of the corporation and kept in active touch with the business through records of business, statements of daily sales, reports of the wheat market and business telegrams regularly sent to him, and in later years when at his home in Indiana the office manager called once a week and discussed the affairs of the corporation. The decedent and his two brothers were the directors and no major business policy was adopted without unanimous consent, meetings of the directors on major policies being held, after the stroke in November, 1915, at decedent's home at Evansville or Newburgh, Ind., unless he was absent from both of those places. The decedent after his stroke did not discuss with his family, his friends, or his business associates the subject of his death. In the later years of his life the decedent spent the late fall and winter months in Florida, and spent part of his time in the summer at Newburgh, Ind. After the decedent created the two trusts and made his last will, he made his home in Florida, living in a residence he bought, the title to which was taken in his wife's name. Shortly after the sale to the Postum Company was made the decedent returned to Indiana from Florida, and discussed with one of his brothers the

investment of their capital in such manner as to relieve their wives of the burden of its care in the event of their "absence." That brother was a witness for the petitioners in the hearing before the Board of Tax Appeals. The following is an extract from his testimony: "After we merged with Postum and had received our payment, he, as well as myself, was very much concerned as to how to invest this money so that in the event of our absence our wives would not have the burden of it in the care of it. In our discussion as to how to invest his money, the decedent did not discuss the possibility of his dying any more than it was a thing that would happen to any one of us' at any time, and while it might be some years ahead we ought to be prepared for any eventualities, and get all three of our estates fixed up. I discussed this with both of my brothers, Leslie and the decedent, Addison W. In discussing this matter with my brother, he just thought like you would today, that if you wanted to have your wife put in a position to be relieved from these things, and the way I felt with my wife, we did not know when that would take place, and we wanted to do it while we were clearheaded and when there was no rush; we discussed that the first week or two after he returned from Florida, in the late spring or early summer." The lawyer who prepared the two trust instruments and the will discussed with the decedent the matter of two trusts and the preparation of the will. That lawyer was a witness for the petitioners. He testified that at the first meeting with the decedent in April, 1926, the decedent stated in effect that for the first time in his life, through the sale to the Postum Company, he had become possessed of independent means which were free, and he wished first of all to make some provision for his wife that would make her independent and give her a competence consistent with what he had, and also that he thought it wise that she should begin to learn something about the care of property; that with regard to the other trust the decedent stated that he wished to withdraw a substantial part of the Postum stock or Igleheart Bros., Inc., stock from his own holdings, and put them in the hands of a competent trustee; that he wished, however, to reserve the right to call upon it if he needed to do so, to reserve the right to the in-

come, to distinguish between his general estate and this trust, so it would go down, after the lives of his children, to the grandchildren, making a distinction between those who had issue and those who had not, and passing the entire remainder to his grandchildren only; that decedent further stated that he had been spending the winters in Florida for several years, that he proposed to go back there, and, as he then felt, would probably make his legal home there, and, from what he had heard from friends and acquaintances in Florida, there had been a good deal of dissatisfaction at times with the administration of trusts and estates in Florida, through local administrators and local counsel, and that he did not care to have the trust, which would represent the major part of his estate, where it would be subject to the administration of a Florida court, if he made his legal residence there; that he wished to pick his own trustee and fix the terms of the trustee's compensation. A witness for the petitioners testified that he discussed with the decedent the matter of placing property of the latter in trust; that decedent had a two or three fold purpose in establishing the trust in favor of his wife; that his idea was to reduce income tax, and his other reason was to give his wife an independent income, and school her in investments. The witness stated: "He spoke to me about reducing income taxes in May, right after he returned to Evansville; he mentioned that his income would be much greater, and he asked me if it were possible to do that and save taxes, and I told him yes. I told him the method to be employed, the scope would be up to him."

█ The statute applicable to the property transfers made by the two trust instruments in question contains a provision to the effect that where within two years prior to his death, but after the enactment of that statute, the decedent had made such a transfer or transfers of any of his property or an interest therein, "not admitted or shown to have been made in contemplation of or intended to take effect in possession or enjoyment at or after his death, and the value or aggregate value, at the time of such death, of the property or interest so transferred to any one person is in excess of $5,000, then, to the extent of such excess, such

transfer or transfers shall be deemed and held to have been made in contemplation of death within the meaning of" that statute. Section 302 (c) of Revenue Act of 1926, 44 Stat. 9 (26 USCA § 1094 (c). After the death of the decedent, and after the determination by the respondent of the estate tax deficiency in question, that provision, which creates a conclusive presumption that gifts made within two years prior to the death of the donor were made in contemplation of death, was decided to be constitutionally invalid. Heiner v. Donnan, 285 U. S. 312, 52 S. Ct. 358, 76 L. Ed. 772. It appears from the opinion of the Board of Tax Appeals that that tribunal held that the petitioners must establish by a preponderance of evidence that the transfers in question were not, in fact, made in contemplation of death or to take effect in possession or enjoyment at or after the decedent's death. The petitioners challenge the correctness of that ruling. Nothing contained in the record indicates whether the respondent's determination of the estate tax deficiency in question was based on the statutory presumption referred to or on his conclusion from evidence with reference to the transfers in question. As to the respondent's determination of the estate tax deficiency in question, nothing is shown by the record other than the written notice to petitioners of such determination and the accompanying statement showing the differences between the computation contained in petitioners' estate tax return and the computation upon which respondent's determination of the estate tax deficiency was based. By the terms of the statutory provision referred to the presumption thereby purported to be created applies only to a transfer or transfers by the decedent "not admitted or shown to have been made in contemplation of or intended to take effect in possession or enjoyment at or after his death." Nothing contained in the record negatives the conclusion that respondent's finding that the transfers in question were made in contemplation of death was based on evidence supporting that finding. In the indicated condition of the record it seems that it cannot reasonably be inferred or presumed that the respondent, in determining the estate tax deficiency in question, acted on the invalid presumption purported to be created by the statutory provision referred to. The action of an official is presumed to be correct in the absence of a showing of its incorrectness. The burden was on the petitioners to establish the invalidity of the respondent's determination of the estate tax deficiency in question. Lucas v. Kansas City Structural Steel Co., 281 U. S. 264, 271, 50 S. Ct. 263, 74 L. Ed. 848; Helvering v. Taylor, 293 U. S. 507, 515, 55 S. Ct. 287, 79 L. Ed. ——; Flynn v. Commissioner (C. C. A.) 77 F.(2d) 180.

The dominant purpose of the provision of the estate tax statute for including in the estate to be taxed property transferred by the decedent in contemplation of death is to reach substitutes for testamentary disposition and thus to prevent the evasion of the tax. United States v. Wells, 283 U. S. 102, 117, 51 S. Ct. 446, 75 L. Ed. 867; Nichols v. Coolidge, 274 U. S. 531, 542, 47 S. Ct. 710, 71 L. Ed. 1184, 52 A. L. R. 1081. It is manifest that much property would escape the tax if one could evade it by making gifts during life instead of bequeathing property by will or permitting it to be disposed of under intestacy statutes. The words "in contemplation of death" mean that the thought of death is the impelling motive of the transfer, whether there is or is not a consciousness or belief that death is imminent. A gift is to be regarded as made in contemplation of death where the dominant motive of the donor is to make proper provision for the donee after the death of the donor. In determining whether a transfer was or was not made in contemplation of death due consideration must be given, not only to testimony as to what was said by or to the decedent with reference to the transfer at and prior to the time it was made, but also to the evidence as to the circumstances attending the making of the transfer. "There is no escape from the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condition, and thus give effect to the manifest purpose of the statute." United States v. Wells, supra, 283 U. S. 102, page 119, 51 S. Ct. 446, 452, 75 L. Ed. 867. The above set out part of the testimony of the decedent's brother as to the witness and the decedent discussing the matter of being prepared for any eventualities, of getting

their estates fixed up, and doing it while they were clear headed and when there was no rush, as to how to invest money received in the sale to the Postum Company, "so that in the event of our absence our wives would not have the burden of it in the care of it," persuasively indicates that in executing the two trust instruments the decedent had his death in mind. It is not reasonably conceivable that some of the things said by the decedent in conversations with the lawyer who prepared the two trust instruments, as deposed to by that lawyer, particularly as to the decedent's making provision for his grandchildren, and as to the administration of trusts and estates in Florida, could have been said, if, at the time those conversations occurred, the decedent did not have in contemplation his own death. Such deposed to statements of the decedent have an enhanced tendency to prove that the two trust instruments in question were made in contemplation of death when the testimony in regard thereto is considered in the light of the circumstances attending the execution of those instruments. Those two instruments and the decedent's will, made at the same time, were parts of a comprehensive scheme or plan embracing the entire estate of the decedent, then having a value in excess of two and a half million dollars. It is manifest from the evidence that for the decedent the sale to the Postum Company meant his final retirement from active participation in business. After that sale his estate consisted principally of money, bonds, and stocks of corporations to which the decedent's relation was that of an investor. By the two instruments he disposed of a substantial part of his estate, and the remainder of his estate was disposed of by will. The creation of the two trusts was not in pursuance of a pre-existing plan or policy of making gifts to members of decedent's family of considerable amounts of property. Evidence showed that previously he had made no such gifts. No evidence indicated that it was contemplated or expected that decedent and his wife would be separated for any considerable period during their lives. It appeared that they were habitually together. In the circumstances attending the reference in the conversations between the decedent and his brother to the former's "absence," it is fairly inferable that the only "absence" referred to was that resulting from death. The combined effect of the three instruments executed at the same time, the two trust instruments and the will, was such an arrangement as to the maker's entire estate, not only during his life, but after his death, as reasonably might be expected to be made by one, situated as the decedent was at the time those instruments were executed, who desired to get his estate "fixed up" and to do so while he "was clear headed and when there was no rush." One of the trust instruments, the one under which the income from the property transferred was to go to the decedent during his life, had features characteristic of a will, in that during his life the decedent was to be the sole beneficiary of the property conveyed, and the instrument, like a will, was subject to be revoked by its maker. Under the evidence it is not fairly open to question that at the time the three instruments were executed the decedent had in contemplation his own death. In the circumstances disclosed it reasonably was to be inferred that each of those instruments, being a part of a comprehensive plan embracing the entire estate of the decedent, including the making of a will, was made in contemplation of death. In behalf of the petitioners it was contended that the evidence showed that the dominant motive influencing the decedent in creating the two trusts was to bring about a reduction of income taxes, and that another controlling motive for the creation of the trust under which the decedent's wife was the trustee was to enable her to become experienced in the management of property. While evidence indicated that the decedent, in creating the two trusts, was influenced by a desire to make taxes on the income from his property less than they would be if he retained title to all of it, yet, as he put into effect a comprehensive plan embracing his entire estate, providing for the disposition and handling of substantial parts of it during his life, and for the disposition of the remainder of it upon his death, it seems reasonable to infer that the arrangement as a whole was made in contemplation of death, and that each of the trust instruments was a substitute for testamentary disposition. The two trust instruments and the will were parts

of what practically was a single transaction, whereby a substantial part of the decedent's estate was put into an irrevocable trust for the benefit of the decedent's wife during her life, the trust property upon her death to go to the descendants of the decedent and herself; another substantial part of the decedent's estate was put into a revocable trust, for the benefit of the decedent himself during his life, and after his death for the benefit of his descendants; and the remainder of decedent's estate was disposed of by will. It hardly could be inferred that decedent had in contemplation his own death only when he made the will, but not when, at practically the same time, he created the two trusts. As the decedent in his will named his wife as executrix thereof, his expressed desire that she "begin to learn something about the care of property" may have had reference to her performance of her duties as executrix, as well as to the care of the property transferred to her as trustee.

The applicable statute (section 302 (c) of Revenue Act of 1926 (26 USCA § 1094 (c) provides that there shall be included in the gross estate of the decedent the value at the time of his death of all property "to the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of * * * his death. * * *" The thing taxed is the transmission of property from the dead to the living. For the purposes of the tax, property transferred by the decedent in contemplation of death is in the same category as it would have been if the transfer had not been made and the transferred property had continued to be owned by the decedent up to the time of his death. As to the property so transferred, as well as to property owned by the decedent at the time of his death, the measure of the tax is the value of that property at the time of the decedent's death. Heiner v. Donnan, supra; Milliken v. United States, 283 U. S. 15, 23, 51 S. Ct. 324, 75 L. Ed. 809; Chase National Bank v. United States, 278 U. S. 327, 337, 49 S. Ct. 126, 73 L. Ed. 405, 63 A. L. R. 388; Snyder v. Helvering, 63 App. D. C. 59, 69 F.(2d) 377. It follows that the Board of Tax Appeals did not err ruling that the value of the assets of the two trusts at the time of the decedent's death should be included in the gross estate in computing the tax.

Section 302 (g) of the Revenue Act of 1926 (26 USCA § 1094 (g) provides for the inclusion in the gross estate of every decedent "of the amount receivable by the executor as insurance under policies taken out by the decedent upon his own life; and to the extent of the excess over $40,000 of the amount receivable by all other beneficiaries as insurance under policies taken out by the decedent upon his own life." The manifest purpose of that provision is to include in the decedent's estate for purposes of the tax the proceeds of all insurance on his life receivable under policies acquired through expenditure by him. Chase National Bank v. United States, supra; Scott v. Commissioner (C. C. A.) 69 F.(2d) 444, 92 A. L. R. 531. The policies, under which the right to change the beneficiaries was reserved, having originally been taken out, for its own benefit, by a corporation of which the decedent was an officer, the applications for which were signed by the decedent, are to be regarded as having been taken out by the decedent, within the meaning of the statute, when he bought those policies from that corporation, and had new beneficiaries, chosen by himself, designated, he retaining the right under each policy further to change the beneficiary. The statute readily could be evaded if a policy, under which the beneficiary may be changed, could be taken out by a corporation or firm on the life of an official or member of that corporation or firm, and the latter could acquire the policy and have a new beneficiary designated, with the result of excluding from his gross estate the amount in excess of $40,000 receivable by the beneficiary under the policy. The ruling under consideration was not erroneous.

The record contains no evidence as to the circumstances attending the taking out by the decedent of the endowment policy on the life of his wife. In the absence of evidence on the subject, it may be presumed that that policy was taken out in such circumstances as to make the value of it, at the date of the decedent's death, part of the decedent's estate for estate tax purposes. This being so, the petitioners failed to sustain the burden of establishing the invalidity of the action of the respondent with reference to that matter.

 The action of the respondent, approved by the Board of Tax Appeals, in including in the gross estate of the decedent subject to the estate tax the value, at the date of the decedent's death, of Federal Farm Loan bonds mentioned, was challenged on the ground that the statute (section 26, Federal Farm Loan Act, 39 Stat. 360 [12 USCA § 931 et seq.]) provides that such bonds and the income derived therefrom "shall be exempt from Federal, State, municipal, and local taxation." 12 USCA § 931. The statute imposed a tax on the transfer of the net estate of every decedent, and provided in substance that, to the extent of his interest therein at the time of his death, the value of all the decedent's property, real or personal, tangible or intangible, wherever situated, shall be included in his gross estate, in computing the tax imposed. Sections 301 (a) and 302 (a) of Revenue Act of 1926 (26 USCA §§ 1092, 1094 (a). The estate tax is not a tax on property. It is an excise on the privilege of transmitting property of a decedent upon his death; the amount of the tax being measured by the value of the property transmitted. Chase National Bank v. United States, 278 U. S. 327, 49 S. Ct. 126, 73 L. Ed. 405, 63 A. L. R. 388; New York Trust Co. v. Eisner, 256 U. S. 345, 41 S. Ct. 506, 65 L. Ed. 963, 16 A. L. R. 660; Knowlton v. Moore, 178 U. S. 41, 20 S. Ct. 747, 44 L. Ed. 969. The provision exempting from taxation Federal Farm Loan bonds and the income therefrom is not violated by measuring the estate tax by the value, at the time of the decedent's death, of all of his property, including such bonds, as the United States may tax the transmission of property upon the death of its former owner, regardless of the character of that property. Plummer v. Coler, 178 U. S. 115, 20 S. Ct. 829, 44 L. Ed. 998; Murdock v. Ward, 178 U. S. 139, 20 S. Ct. 775, 44 L. Ed. 1009; Greiner v. Lewellyn, 258 U. S. 384, 387, 42 S. Ct. 324, 66 L. Ed. 676. In support of the contention that the Farm Loan bonds were taxed by the inclusion of them in the gross assets of the decedent in computing the estate tax, counsel for the petitioners refer to statements contained in the opinion rendered in the case of First National Bank v. State of Maine, 284 U. S. 312, 52 S. Ct. 174, 76 L. Ed. 313, 77 A. L. R. 1401. In that case it was decided that corporate stock could not be made the basis of an inheritance tax in a state other than that of the domicile of its deceased owner. The opinion contained statements to the effect that real property cannot be taxed, or made the basis of an inheritance tax, except in the state in which it is located, and that certain kinds of intangibles, namely, bonds, notes, and credits, are subject to the imposition of an inheritance tax only by the domiciliary state. Those statements had reference to the effect of the location of property upon the taxability by states of the transfer of it at death. Nothing contained in that opinion indicates an intention to depart from previous decisions to the effect that the United States may tax the transmission of property upon the death of its owner, whether that property itself is or is not exempt from taxation. The question of such transmission being or not being taxable by the United States was not involved in that case.

 The petitioners unsuccessfully sought the allowance of a deduction from decedent's gross estate of $1,500 for an obligation in that amount incurred by decedent's estate for the perpetual care and maintenance of a mausoleum and cemetery lot for the remains of the decedent. The statute (section 303 (a) (1) of Revenue Act of 1926, 26 USCA § 1095 (a) (1), authorizes a deduction from the gross estate of "Such amounts for funeral expenses, * * * as are allowed by the laws of the jurisdiction * * * under which the estate is being administered. * * * *" A Florida statute (section 5541, Comp. Gen. Laws Fla. 1927) provides: "Executors and administrators shall be allowed all reasonable charges on account of disbursement for funeral expenses. * * *" The language used imports charges or expenditures incident to the burial or interment of the remains of the decedent. Nothing indicates that the lawmakers had in mind expenditures for the care and maintenance, after the completion of the burial and sepulture, of the place where the body of the decedent was intended to remain. So far as we are advised, no Florida court has construed the statute as covering expenditures for the perpetual care and maintenance of the place where the decedent is interred. The language of the statute falls short of showing that it was intended to enable executors or administrators to obligate the

decedent's estate for the cost of the perpetual care and maintenance of a mausoleum and cemetery lot for the remains of the decedent. We conclude that the disallowance of the deduction in question was not erroneous.

The Board of Tax Appeals refused to comply with a request of the petitioners that judicial notice be taken of the case of Cora B. Igleheart v. Commissioner, pending before that tribunal. It appears that the purpose of the proposal that the other case referred to be considered was to disclose that in that case the respondent took a position inconsistent with a position taken by him in the instant case, in that in the former he contended that the above-mentioned trust instrument under which Cora B. Igleheart was the trustee and a beneficiary was not made in contemplation of death, while in the instant case he contended that that instrument was made in contemplation of death. Neither of the petitioners in her or his executional capacity was a party to the other case referred to. It was not made to appear that the fact as to what position was taken by the respondent in the other case referred to, that case and the instant one not being between the same parties, had any pertinency to the issues in the instant case. The fact, if it was a fact, that in the other case the respondent took a position inconsistent with one taken by him in the instant case would not justify or excuse a failure of the Board of Tax Appeals, or of this court, to sustain a correct position taken by the respondent in the instant case. Furthermore, if in the other case referred to the respondent contended that the trust instrument under which Cora B. Igleheart was the trustee was not made in contemplation of death, that contention was overruled by the decision of the Circuit Court of Appeals for the Seventh Circuit in passing on a petition for review of the decision of the Board of Tax Appeals in that case. Commissioner v. Cora B. Igleheart Trust Estate, 75 F.(2d) 151. It is apparent that the ruling now under consideration was not substantially harmful to petitioners, and is not a ground of reversal.

The record showing no reversible error, the petition is denied.