### BROWN v. COMMISSIONER OF INTERNAL REVENUE.
### No. 7365.

Circuit Court of Appeals, Sixth Circuit.
March 11, 1938.

HICKS, Circuit Judge.

Petitioner is the widow of Guy C. Brown and the executrix of his estate. She is also the beneficiary of the proceeds of eleven insurance policies written upon his life and amounting to $326,648.11. She seeks a review of the decision of the Board of Tax Appeals affirming the action of the Commissioner of Internal Revenue in assessing estate taxes of $17,050.80 upon the proceeds of these policies. The question is, whether the proceeds of the policies were properly included in decedent's gross estate under the provisions of title 26, § 411(g), U.S.C., 26 U.S.C.A. § 411(g), section 302(g) of the Revenue Act of 1926, and Regulations thereunder. The statute includes as one element of the taxable gross estate of the decedent "the amount receivable by all other beneficiaries as insurance under policies *taken out* by the decedent *upon his own life.* \* \* \*" (Italics ours.)

█ Pertinent parts of Treasury Regulations 80, article 25, are quoted: " \* \* \* Insurance is considered to be taken out by the decedent in all cases, whether or not he makes the application, if he pays the premiums either directly or indirectly, or they are paid by a person other than the beneficiary, or decedent possesses any of the legal incidents of ownership in the policy. Legal incidents of ownership in the policy include, for example: The right of the insured or his estate to its economic benefits, the power to change the beneficiary, to surrender or cancel the policy, to assign it, to revoke an assignment, to pledge it for a loan or to obtain from the insurer a loan against the surrender value of the policy. \* \* \*"

For a number of years before his death on January 6, 1931, decedent had been an officer and stockholder of Campbell-Ewald Company, an advertising firm. In February 1924, the stock of the corporation was held by a few persons actively engaged in the business. On that date the stockholders made a contract with the corporation whereby it agreed to purchase the stock of any stockholder who might die. One clause of the agreement pointed out that policies of insurance had been "taken out" on the lives of most of the stockholders including decedent, with the corporation as the beneficiary, for the purpose of enabling it to purchase the stock in the event of the death of any of the insured stockholders. This contract was superseded by another in 1925, which

Edwin S. Bartlett and Henry C. Walters, both of Detroit, Mich., for petitioner.

Harry Marselli, of Washington, D. C. (Robert H. Jackson, Sewall Key, and Arnold Raum, all of Washington, D. C., on the brief) for respondent.

Before HICKS and SIMONS, Circuit Judges, and RAYMOND, District Judge.

contained modifications unimportant here, but both the 1924, and 1925, contracts provided that the price to be paid for the stock should be book-value plus a good-will value to be determined by arbitration.

A third contract dated June 26, 1929, did away with the provisions for the ascertainment of good-will value, a clause therein reading, " * * * the price at which said stock shall be sold to said Company shall be determined by the Company's auditors at the book-value thereof, without taking into consideration anything for good-will and without any further appraisal of the properties or assets of the Company than as shown upon the books of the Company at the date of death of such deceased. * * *"

Clause 2 provided the method of payment for the stock. The amount payable therefor was reduced by the value of the insurance carried by the company on the life of the stockholder to which it was beneficiary and which it agreed to turn over to deceased's executor. In clause 3 the amount of insurance that the company agreed to carry on the lives of the Class "A" stockholders was listed, including $325,000 on that of Brown, the premiums for which "shall be deemed to be additional compensation to said Class 'A' stockholders for services rendered and to be rendered." It was also provided that said insurance should be paid to deceased's executors or otherwise and "shall not inure to the benefit of said Campbell-Ewald Company in any way."

In the fifteenth clause was an engagement by Class "A" stockholders not to dispose of, nor pledge their stock or otherwise place it beyond their control without the written consent of the board of directors. In the sixteenth they agreed to make a last will and testament providing for the disposal of the stock according to the terms of the contract; and in the seventeenth they likewise bound their estates.

The eighteenth clause provided that the cash surrender values of the policies transferred to the individuals by the company should follow the policies, *except that $56,961.30 accrued to Guy C. Brown should not be so transferred.* It was provided that this sum should be reduced from time to time, until liquidated, by any dividends accumulating on the policies after the expiration of the necessity for the payment of premiums; *and, in the event of his death prior to the liquidation, that it should be canceled.*

All other dividends and accrued interest allowed to accumulate on the policies prior to the transfer were assigned by the policyholders to the company for credit against future premiums which it agreed to pay.

This contract was made binding upon the heirs, executors, etc., of the parties, and petitioner joined therein as the wife of Brown.

After the contract of June 26, 1929, and pursuant thereto and prior to December 10, 1930, the company in one form or another relinquished its right to death benefits under the policies.

The third contract was followed by another executed on December 10, 1930. Many of its provisions were similar to those of the third. Two of the wives, including petitioner, had by that time become owners of Class "A" stock, and they, joining in the contract, agreed to dispose of their stock to the company in case their husbands died before them.

Clause 2 set forth the method to be used by the company in paying for stock out of insurance on the lives of deceased stockholders, of which it was the beneficiary. Clause 5 was the same as clause 3 in the third contract.

Clause 18 read: "Each of * * * parties agrees that he will not at any time sell or dispose of any of his class 'A' stock in said Company, except as herein provided, and that he will not pledge the same as collateral or place it beyond his control without written consent of said company acting through its Board of Directors."

Clause 21 is the same as the eighteenth in the third contract, with the additional provisos, that Brown would transfer to the company all dividends and interest accruing on the endowment policies and left with the insurance companies until his death; that on his death the face amount of the policies *should be paid to the beneficiaries as provided therein* and further that Brown would not accept any cash surrender value for the endowment policies prior to his death or borrow on same without the written consent of the company.

It was stipulated that the books of the company disclosed the payment of $72,976.35 in premiums on the policies here in controversy, prior to June 26, 1929, the date of the third agreement, no portion of which amount was credited or charged to the decedent as additional compensation; and that subsequent to that date its books showed

the payment of $27,668.06 in premiums; the entire amount of which was credited to de-, cedent as additional compensation, in accordance with the language of the agreement of that date and of the subsequent agreement of December 10, 1930.'

Construing these contracts in relation to each other, it seems clear enough that decedent possessed all of the legal incidents of ownership in the policies at the time of his death. It was he to whom the company assigned its interest and it was he who was vested with the power to name the beneficiary. This he did, naming the petitioner, but in every instance he retained the privilege of changing it. It is true that the cash surrender value of the policies was not transferred to decedent by the contracts but was retained by the company as a sort of charge which Brown had the right to liquidate by the payment to it of certain accumulated dividends and interest, but the obligation to pay any remaining balance was automatically discharged by the event of his death.

There is no record evidence that the decedent repaid in cash the $72,976.35 in premiums which the company had paid prior to the date of the third contract but the petitioner was unsuccessful in showing that he did not. Upon the other hand there is a clear inference that he did, because by the terms of the third and fourth contracts the decedent relinquished any consideration for the good-will values of the stock sold to the company. We can conceive of no consideration for this except a relinquishment to the decedent of any obligation to repay these premiums. See Yuengling v. Commissioner, 3 Cir., 69 F.2d 971.

It is apparent, therefore, that when tested by Treasury Regulations 80, Article 25, it was not error to include the proceeds of the policies in the decedent's gross estate.

But petitioner insists that article 25 of Treasury Regulations 80 is invalid; that it makes the possession by decedent of any of the legal incidents of ownership in the policies a test of whether the policies were taken out by the decedent upon his own life; that article 25 of Regulations 70 is the proper one to be applied because after the promulgation of Regulations 70 the statute was re-enacted without substantial change and that the courts must therefore adopt the construction of the statute placed upon it by article 25 of Treasury Regulations 70. See Walker v. United States, 8 Cir., 83 F.2d 103, 106.

But the facts here involved do not call for a construction of article 25, Regulations 80. This article specifically defines what is included in the term "legal incidents of ownership in the policy." Petitioner has not placed herself beyond the scope of this definition, as in the Walker Case, where the premiums or at least a portion of them had been paid by the beneficiary. In this case she paid no premiums. We see no reason for striking down Regulations 80, article 25, as a whole because one element of it has been found inapplicable to an entirely different state of facts.

Petitioner admits that the decedent had the power to change the beneficiaries in the policies (one of the legal incidents of ownership) but maintains that he deprived himself of the right to exercise that power by agreeing in the fourth contract to transfer the interest and dividends on the proceeds of the policies to the company as they accrued. We concur in the conclusion of the Board that there was nothing in these collateral agreements that would restrict the right which decedent had reserved for himself to change the name of the beneficiary. See Helvering, Com'r, v. Reybine, 2 Cir., 83 F.2d 215.

Petitioner next says that she had an equitable interest in the policies which negatives the decedent's right to change the beneficiaries. This claim is based upon the fact that after the execution of the third contract there had been transferred to her 1,000 of the 2,450 shares of Class "A" stock of decedent and that she joined in the fourth contract to the end that all Class "A" stock should vest in the company. But there is nothing in the fourth contract to indicate that her rights as beneficiary in the policies became "fixed" because she joined in the contract. She knew that even by the third contract the power to change the beneficiary was reserved to the decedent and that he had exercised that power in her behalf. She acquired that status because she had been designated as such by decedent and not because of any equitable interest she may have had in the policies.

But laying aside Treasury Regulations 80, article 25, and testing the case by the act itself as interpreted by Igleheart v. Com'r, 5 Cir., 77 F.2d 704, at page 711, the proceeds of the policies were subject to the

tax. In that case the court said: "The manifest purpose of that provision" (§ 302 (g) of the Revenue Act of 1926) "is to include in the decedent's estate for purposes of the tax the proceeds of all insurance on his life receivable under policies acquired through expenditure by him. Chase National Bank v. United States, supra [278 U.S. 327, 49 S.Ct. 126, 73 L.Ed. 405, 63 L.Ed. 388]; Scott v. Commissioner (C. C.A.) 69 F.2d 444, 92 A.L.R. 531. The policies, under which the right to change the beneficiaries was reserved, having originally been taken out, for its own benefit, by a corporation of which the decedent was an officer, the applications for which were signed by the decedent, are to be regarded as having been taken out by the decedent, within the meaning of the statute, when he bought those policies from that corporation, and had new beneficiaries, chosen by himself, designated, he retaining the right under each policy further to change the beneficiary."

In recognition of a stipulation between the parties the deficiency is fixed at $17,050.80 instead of $27,162.91 as determined by the Board, and with this modification the decision of the Board of Tax Appeals is affirmed.