**ORVIS et al. v. HIGGINS.**

**Civ. 25-271.**

United States District Court
S. D. New York.

June 14, 1948.

Arthur Butler Graham, of New York City, for plaintiffs.

John F. X. McGohey, U. S. Atty., of New York City (Samuel Rudykoff, Asst. U. S. Atty., of New York City, of counsel), for defendant.

CONGER, District Judge.

This is an action for the refund of estate taxes in the sum of $243,577.43, assessed pursuant to Section 302(c) of the Revenue Act of 1926, as amended, 26 U.S. C. § 811(c), 26 U.S.C.A.Int.Rev.Code, § 811(c).

The decedent, Edwin W. Orvis, died testate on April 29, 1939, at the age of 85 years.

On March 8, 1932, the decedent executed four deeds of trust, the terms of which provided for income to his wife for life, and upon her death the income was to be paid to his four sons for life. The trusts in respect of which the sons Warner, Homer and Arthur Orvis were secondary beneficiaries provided for payment of principal upon their deaths to their surviving issue; in

default of issue then to their brothers and the issue of any brother; and failing brothers or their issue, the principal was to be paid as the brothers might direct and appoint by will. The trust of which the fourth son, Schuyler, was the secondary beneficiary made provision for the payment of principal upon his death as he might direct by his last will and testament, and failing to exercise the power, then the principal would be distributed in the manner of the other three trusts.

On June 4, 1932, the decedent executed a deed of trust providing for a life income to his wife. On her death the trust estate was required to be divided into four equal parts with each son the beneficiary of the income as to one share. The principal was payable on the death of the sons as each might direct and appoint by will; in default of such appointment then to his surviving issue, or to brothers, or their issue.

On December 19, 1934, Mr. Orvis executed a deed of trust providing for income to his wife for life with the remainder to the four sons; provisions for issue and for brothers, or issue, in case the sons predeceased the settlor were included.

The fact amount of all the trusts was $1,000,000, divided as follows:

The four trusts of March 8, 1932, $100,000 each

The trust of June 4, 1932, $300,000

The trust of December 19, 1934, $300,000.

The Commissioner of Internal Revenue determined that the corpus of each of the trusts of March and June, 1932 was includible in decedent's gross estate for tax purposes under Section 811(c) of the Internal Revenue Code, 26 U.S.C.A.Int.Rev. Code, § 811(c), and that the December, 1934 trust was includible to the extent of the value of Mrs. Orvis' trust at the date of decedent's death, it being reciprocal to her trust executed in December, 1934, and accordingly assessed the estate the sum in dispute. The plaintiffs paid the tax, and filed claim for refund; the claim was rejected, and this action ensues.

On the trial there were three issues:

1. Were the transfers made in contemplation of death?

2. Were the transfers intended to take effect in possession and enjoyment at or after the decedent's death?

3. Was the trust of the decedent, dated December 19, 1934, and of decedent's wife, dated December 13, 1934, reciprocal?

Some time after the trial had been finished the United States Attorney (the attorney of record for defendant) notified me that in the light of the provisions of the Amended Regulations contained in T.D. 5512, the Government withdrew its defense that the transfers of March 8, 1932 and of June 4, 1932 were intended to take effect in possession and enjoyment at or after death within the meaning of § 811(c) of the Internal Revenue Code.

The Government now argues that all of these trusts were made "in contemplation of death"; that in addition, the trust of December 19, 1934 was reciprocal to the trust that Mrs. Orvis, the wife of the decedent, created on December 13, 1934 and, therefore, the latter trust is includible in decedent's estate under Section 811(d) of the Code.

The case was tried without a jury.

A rather peculiar situation presents itself, which I should discuss and dispose of at the outset. Plaintiffs have called my attention to the fact that the Commissioner when he assessed the deficiency tax did not do so on the ground that the trusts were made in contemplation of death. This appears to be correct.

Although the Commissioner in the 30-Day Letter does refer to Section 811(c) of the Internal Revenue Code, which contains among other things the provision which makes taxable a trust made in contemplation of death, still the method he used in arriving at the deficiency tax indicates that he had in mind only that the decedent had made a gift intended to take effect in possession and enjoyment after death (also covered by Section 811[c]).

This refers to the trusts of March 8, 1932 and the trust of June 4, 1932. It also clearly appears that in assessing the deficiency tax on the trust of December 19, 1934 the Commissioner did so on the ground that the two trusts made by decedent and the other made by his wife were reciprocal.

Plaintiffs do not urge that the assessments as so made preclude the Government of interposing a defense here that the trusts were made in contemplation of death, but they do assert that by reason thereof no presumption arises that the Commissioner was correct as to whether or not decedent made the gifts in contemplation of death, inasmuch as he made no such finding. Plaintiffs, on the contrary, urge that it should be presumed that the Commissioner found that the gifts contained in the trust deeds were not made in contemplation of death.

In the latter contention I cannot agree with plaintiffs. This question of presumption, it seems to me, is of little significance here.

The deficiency tax has been assessed by the Commissioner. It was paid by decedent's estate and decedent's executors now sue to get it back on the ground that it was wrongfully and illegally assessed and collected. The Government has answered and denied that the tax was an illegal tax. This, of course, created the issue which was tried before me.

The burden was upon the plaintiffs to prove their case by a preponderance of the credible evidence, i. e. they had the burden of proving that the deficiency tax was an illegal tax.

One of the issues raised by the pleadings and litigation before me was whether or not the gifts were made in contemplation of death. Before they may succeed, plaintiffs must meet that issue by proof of which they have the burden, a duty which comprises more than the duty imposed by the presumption. So we, therefore, may disregard the presumption. First Trust & Deposit Co. v. Shaughnessy, 2 Cir., 134 F.2d 940, certiorari denied 320 U.S. 744, 64 S.Ct. 46, 88 L.Ed. 442.

I shall first take up the Government's claim that all the trusts were made in "contemplation of death." If they were, then the transfer may be subjected to assessment and tax. The law is well settled on this subject. It is the application of the law to factual situations that gives rise to controversy in some cases. This is one of those cases. I feel that a resume of the facts at this time may be helpful. There is no real controversy over the facts. This issue may be decided by giving full credit to the evidence of both parties, which I do.

The maker of these trusts, Mr. Orvis, was 85 years old when he died on April 29, 1939. Until shortly before his death he was in good health. When he executed the trusts in 1932 and 1934, he was in good health and seemingly had no premonition of an imminent departure from this world. He came from a long-lived family. Mr. Orvis was a man of large means. His father and brother, in 1872, founded the firm now known as Orvis Brothers & Co. He became a partner in that firm in 1874 and continued as a partner and was actively engaged in the business until the end of 1930.

The firm conducted a stock and commodity brokerage business. Decedent was a member of the Stock Exchange and specialized in the securities of U. S. Rubber, Norfolk & Western Railway Co., Delaware & Hudson Railroad Co. and Morris & Essex Railroad.

Decedent was actively engaged in the business from 1874 to the end of 1930 at which time he ceased to be a general partner of the firm, but did become a special partner [January 1, 1931]. At this time he was 77 years of age.

From and after the year 1931 Mr. Orvis, when he was in town, frequently came to the office. He travelled by subway, usually alone. This continued almost to the time of his death. After March, 1932 his health was very good. Physically he was energetic and mentally he was alert although a change did come over him after his wife's death in 1938. They had been married 53 years and had been constant companions. He took her death very hard. He had a little trouble with his eyes. He took care of his own financial affairs up to the date of his death.

Mr. Orvis was active in social affairs. He was a member of many organizations including the Seventh Regiment Veterans' Society, Sons of the American Revolution, Founders and Patriots Society, New York

68

Historical Society, New England Society, New York Athletic Club and the Union League Club. He was active in church affairs. He and Mrs. Orvis were regular church attendants.

Mr. Orvis was an ardent fisherman. He fished in Canada and Long Island. He was a member of a fishing club there. He went on a fishing trip to this club as late as 1938 with one of his sons.

Mr. and Mrs. Orvis travelled extensively. From 1924, they took one extended trip yearly. They went to Egypt, Palestine, North Africa and made many trips to Europe. They made many motor trips in Europe and in this country. In 1932 they went on a motor trip through Europe; to France, Switzerland and Italy. In 1934 they took a 5,000 mile motor trip through New York, Maine, Ontario, Quebec, New Brunswick, Massachusetts and New Hampshire. In 1935, from June 30 to September 18, they travelled 8,000 miles by motor through France, Belgium, Holland and other countries in Europe. In 1936 they took an extended motor trip through the New England states. In the summer of 1937 they again motored through New England. On all of these motor trips, Mr. and Mrs. Orvis travelled alone except for a chauffeur.

Mr. Orvis sent back many letters and postal cards while he was on these trips. His handwriting was strong and clear and the contents of these letters and cards showed that Mr. Orvis had a clear grasp of public and financial affairs and that at all times, even down toward the last trip, he was cheerful and in good spirits and in apparent good health.

After the death of Mrs. Orvis, decedent continued to live at their apartment in New York City. He lived there alone and maintained the apartment with the help of two maids.

I have gone into the life and habits of Mr. Orvis at some length because it gives the picture of this man as he was up to the time of his death.

After his wife's death and up until February, 1939, Mr. Orvis was in fair health but his spirit was gone. He grieved over her death.

Mr. Orvis, as I stated before, was a man of means. His income tax return for 1932 shows a net estate of about $2,800,000. At his death his gross estate was about $2,900,000.

Mrs. Orvis had means of her own. Her income in 1932, subject to Federal Income Tax, was $49,000. Her tax exempt bonds in 1932 amounted to approximately $900,000 and in 1934 to approximately $1,100,000. At her death her net estate was about $1,380,000.

In 1932 and 1934, decedent had the following heirs:

Carrie E. Orvis, wife, born January 10, 1860; Warner D. Orvis, son, born July 7, 1886; Arthur E. Orvis, son, born July 21, 1888; Homer W. Orvis, son, born August 23, 1890; Schuyler A. Orvis, son, born June 30, 1892.

In addition there were three grandchildren.

Warner D. Orvis since 1931 has been senior partner of Orvis Brothers & Co. Neither in 1932 nor in 1934 was he dependent on his father for support.

Arthur E. Orvis was with Orvis Brothers & Co. for a number of years prior to 1932. At the time of the making of the trusts he was not dependent on his father for support.

Homer W. Orvis has been with Orvis Brothers & Co. since 1914. In 1932 and 1934 he was not dependent of his father for support.

Schuyler A. Orvis, between 1917 and 1943, was a member of the Stock Exchange. Schuyler had financial reverses and his father helped him. He paid his debts for some time and gave him an allowance of $450 a month.

I will not take up at some length the reasons which Mr. Orvis gave for creating these trusts. The testimony on this branch of the case came in a large part from two of decedent's sons. They are interested in the result here, yet I was impressed by their testimony. I see no reason to disbelieve it.

In 1932 decedent called his son, Homer, into his office. He then told his son that he was contemplating making a trust; that in 1928 he had been approached by the

trust departments of various New York banks, suggesting that he make living trusts. Decedent then gave to his son the reasons which had prompted him to make the trusts. He said that the Stock Exchange prices were nearly at the bottom of a declining market; that he was upset about conditions in the United States, especially economic conditions; that his youngest son, Schuyler, had several unfortunate financial experiences, and he wished to make a trust to take care of him, so that if he should not be more successful in his financial ventures in the future than he had been in the past he would always be taken care of; that he was contemplating travelling and he would like to relieve himself of some of the responsibility and place it on one of his sons; that he was going to makes trusts for all of his sons, as he always tried to treat them the same; that he called it the "Gutter Trust" to keep the four boys out of the gutter; that he had put in the trusts a spendthrift clause so that if the boys had trouble at home their wives could not touch it, the tradespeople could not get hold of it and it could not be touched and could not be hocked. The son testified that "that was one of his expressions. You could not hock it and you could not get an advance, and if we were foolish with any money which we had, this would keep us out of the gutter, so we nicknamed it the 'Gutter Trust'."

Decedent then requested his son Homer to act as one of the trustees of the contemplated trusts.

In May, 1932, decedent told his son, Homer, that he was thinking of making further trusts; that he was going to Europe that summer and that there was a bill in Congress, which was expected to pass, creating a gift tax and that he wanted to make the trusts before that bill became a law, which he said might be July 1, 1932; that decedent was hurrying the attorney to get the trusts finished before the gift tax bill passed; that decedent did not discuss at any time with his son Homer the general subject of inheritance or estate taxes.

Walter H. Merritt, an attorney who drew the trust indentures, testified, and I have no reason to doubt his testimony, that Mr. Orvis just prior to March, 1932, discussed with him the execution of the first four trusts; that Mr. Orvis stated that he had retired at the end of December, 1930, as an active partner of Orvis Brothers & Co.; that he and his wife found their enjoyment in travel and that they wanted to be able to travel as the spirit moved them; that he was mindful of the business depression that had set in, incident to the Stock Market crash in 1929 from which this country had not yet recovered; that he was greatly disturbed and concerned over the financial outlook and that he was concerned about his sons as to their financial interests, particularly the son, Schuyler; that Schuyler had been in more or less financial difficulties for some time. Mr. Orvis then asked Mr Merritt about including a spendthrift trust provision in each of the four trusts of March 8, 1932.

Mr. Merritt stated that he was not sure that such a provision would be worth much but Mr. Orvis said he wanted it in the trusts; that he thought it might have some psychological benefit if the trusts had some such clause in them; that because of his anxiety about the financial and economic conditions he did want to put some part of his assets in trusts with trustees to take care of and to assume the responsibility of investing. Mr. Orvis also mentioned the pending gift tax bill in Congress.

Mr. Merritt also testified that he drew the trust agreement of June 4, 1932, and that Mr. Orvis stated that he was making a trust settlement under the same circumstances and for the same reasons that he had stated with respect to the four March 8th trusts.

On March 8, 1932, Mrs. Orvis executed two trusts for the benefit of her two sisters. These trusts are in no way related to the trusts under review. They do indicate, however, that both Mr. and Mrs. Orvis were trust minded. Mr. Merritt further testified that in his talks with Mr. and Mrs. Orvis preparatory to drawing the trust instruments, neither of them ever discussed with him any saving that could be effected in inheritance or estate taxes by making trust gifts; that he never discussed with Mr. Orvis the subject of inheritance taxes.

Warner D. Orvis, one of decedent's sons, also testified for plaintiffs. He stated that he did not know of the March and June trusts until they had been executed; that he had been away on an extended trip; that on his return his father then told him of the execution of the trusts, stating that the youngest brother had shown inability to handle financial affairs; that decedent's thought in making these trusts was to provide each of the sons with some income so that they never would get stranded; that he wanted to treat all of them equally; that his father at one time prior to 1934 said, "Some day the Government is going to get a good slice, a considerable amount of money that I am possessed of, inheritance taxes"; that he had heard decedent use the term "Gutter Trust" in connection with Schuyler's seeming inability to handle funds.

So far I have made no reference to the reasons given by Mr. Orvis for the creation of the trust of December, 1934. There was not too much evidence given by the plaintiffs on this point. However, the trust is of the same pattern as the others and what evidence there was about this trust is set forth later in connection with the other issue in the case.

In addition to documentary evidence the Government offered two witnesses on its case.

The first and the more important was a representative of the Empire Trust Company. He testified that on May 18, 1934 he called upon Mr. and Mrs. Orvis; that the Trust Company had had a campaign following the publication of a book; that Mrs. Orvis had written the Trust Company that she was interested and pursuant thereto the witness had called at the Orvis home; that he talked with Mr. Orvis for about two hours about trusts; that Mr. Orvis stated he had several trusts and might be interested in creating another; that they discussed gift taxes; that the size of the trust was to be limited only by the provision of the gift tax regulation; that they also discussed the subject of wills but this subject was introduced by the witness and not by Mr. Orvis; that subsequently and on or about May 21, the witness sent a letter to Mr. Orvis in which he explained more fully the subject of their talk, in the nature of a sales argument. The letter dwelt upon two topics only: [a] the creating of a living irrevocable trust in connection with the new gift tax regulation, and [b] the advisability of naming the Empire Trust Company as co-executor in his will; that on June 8, 1934, he again called upon Mr. Orvis who then stated to him "that if I could offer him some way where he could save a great deal of money in estate taxes that the picture may be different"; that the witness returned to his office and had an associate prepare a memorandum illustrating the saving in inheritance tax, based on the creation of an irrevocable living trust in connection with an estate of $5,000,000.

On June 12, 1934, the witness delivered this memorandum to Mr. Orvis who said he would give careful attention to it later; the witness never saw Mr. Orvis after that, although on several occasions he tried to get in touch with him. There is no evidence that Mr. Orvis ever made use of the memorandum. He did create a trust in December, 1934, of $300,000. and named the Empire Trust Company as Trustee but the evidence indicates that the arrangements were made by one of the Orvis sons and there is evidence that Mr. Orvis "shopped around" a bit before he decided on the Empire Trust Company as Trustee.

The other witness for the Government was an Internal Revenue Agent connected with the Estate Tax Unit of the Treasury Department. I do not regard his testimony as having any weight in the determination of the issues before me. His testimony related to several conferences he had with Mr. Merritt, the attorney for Mr. and Mrs. Orvis and was largely in connection with the alleged reciprocal trusts of December, 1934.

Having discussed the evidence, it now remains to decide just what conclusions one may draw from it. What was the dominant motive of the decedent in creating these trusts? At once may be ruled out a finding that the trusts were created because Mr. Orvis had a consciousness of imminent death or that death was near at hand. All the evidence points to

the contrary. That is not the answer, however. The rule as to what constitutes "in contemplation of death" is laid down in United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867. There, the Court in discussing the question of transfers in contemplation of death, stated, 283 U.S. at page 117, 51 S.Ct. at page 451: "As the test, despite varying circumstances, is always to be found in motive, it cannot be said that the determinative motive is lacking merely because of the absence of a consciousness that death is imminent. It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. It is conceivable that the idea of death may possess the mind so as to furnish a controlling motive for the disposition of property, although death is not thought to be close at hand. Old age may give premonitions and promptings independent of mortal disease. Yet age in itself cannot be regarded as furnishing a decisive test, for sound health and purposes associated with life, rather than with death, may motivate the transfer. The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is 'near at hand'."

What must be determined in this case is the motive which prompted Mr. Orvis to create these trusts. Even though decedent had no idea that he was about to die, was the thought of death the impelling cause of the transfers? In other words for some reason did decedent become concerned about what would happen to his property at his death and as a result did he take action to control or in some manner to affect its devolution, or were these gifts, even to those who were the natural and appropriate objects of the donor's bounty, motivated by purposes associated with life, rather than with the distribution of property in anticipation of death? United States v. Wells, supra; Allen v. Trust Company of Georgia, 326 U.S. 630, 66 S.Ct. 389, 90 L.Ed. 367.

Again as the Court said in the Wells case, supra: "It is apparent that there can be no precise delimitation of the transactions embraced within the conception of transfers in 'contemplation of death,' as there can be none in relation to fraud, undue influence, due process of law, or other familiar legal concepts which are applicable to many varying circumstances. There is no escape from the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condition, and thus to give effect to the manifest purpose of the statute." [283 U.S. at page 119, 51 S.Ct. at page 452]

I have given this case that careful scrutiny. It has not been an easy matter to decide. I have listed above and hereinafter at some length the reasons which decedent gave for the creation of these trusts. These reasons are the motives. To me they seem substantial and indicate to me that Mr. Orvis in the creation of these trusts was motivated by "purposes associated with life" rather than the distribution of property in anticipation of death, even though the donees were the natural and appropriate objects of his bounty.

It is urged among other things that Mr. Orvis created these trusts to escape estate taxes. If that were the dominant motive here, of course then these trusts would be substitutes for testamentary disposition and of course the tax would be justified. I do not so find, however. Mr. Orvis was a man well versed in financial affairs. He unquestionably knew of estate taxes, but a careful review of all the evidence has failed to convince me that these trusts were created for the purpose of evading estate taxes. As the Court said in Allen v. Trust Company of Georgia, supra: "On the other hand, every man making a gift knows that what he gives away today will not be included in his estate when he dies. All such gifts plainly are not made in contemplation of death in the statutory sense. Many gifts, even to those who are the natural and appropriate objects of the donor's bounty, are motivated by 'purposes associated with life, rather than with the distribution of property in anticipation of

death.'" [326 U.S. at page 635, 66 S.Ct. at page 392.]

We find lacking here also a comprehensive plan or scheme including the making of a will embracing the entire estate of decedent or even the larger part of his estate. See Igleheart v. Commissioner, 5 Cir., 77 F.2d 704. Nor was Mr. Orvis "putting his house in order against the time of his demise." See Updike v. Commissioner, 8 Cir., 88 F.2d 807, certiorari denied 301 U.S. 708, 57 S.Ct. 942, 81 L.Ed. 1362. No will was executed by Mr. Orvis at or near the time he executed any of these trusts.

One other point remains for disposition.

■ The defendant seeks to tax the corpus of the trust executed by Mrs. Orvis on December 13, 1934 as part of decedent's estate. This imposition is grounded in the theory of reciprocal trusts or cross trusts as expounded in Lehman v. Commissioner, 2 Cir., 1940, 109 F.2d 99, certiorari denied 310 U.S. 637, 60 S.Ct. 1080, 84 L.Ed. 1406. The companion trust was executed by the decedent on December 19, 1934. The defendant points to the circumstances of their execution, and urges that such circumstances are sufficient to establish the reciprocal nature of the trusts. They were executed six days apart, the decedent is the life beneficiary of his wife's trust and his wife is life beneficiary as to his, and the principal beneficiaries are the issue of the settlors, who are identical. It is clear that the settlors knew of each other's intentions prior to the execution of the trusts.

On the other hand, the plaintiffs assert that the trusts were independent acts, prompted by dissimilar motives, and in nowise made in consideration of each other.

It appears that some time prior to December 13, 1934, Mrs. Orvis spoke to her son, Arthur, in connection with the creation of her trust. Her action was apparently prompted by the impending enactment of increased gift taxes, a fact of which she was aware through a bank circular, if not through other sources. Arthur suggested that she consult her eldest son, Warner, who was more familiar with such matters. The family attorney, Mr. Merritt, was consulted and the trust was arranged. Warner accompanied his mother to the Fifth Avenue Trust Company where it was executed on December 13, 1934. The decedent was not present.

A few days prior to December 19, 1934, the decedent called Mr. Merritt and requested that he draw up a trust for him. Mr. Merritt used, at decedent's suggestion, the form of the Fifth Avenue Trust Company, the one used by Mrs. Orvis. However, the trustees were different, another bank being named co-trustee, after decedent had "shopped around" for one which would serve at rates pleasing to him. Mrs. Orvis was not present when the decedent executed his trust.

Arthur E. Orvis testified that late in November, 1934 his mother spoke to him about the contemplated trust; that she had received "communications from various trust companies pointing out that there would soon be an increase in gift taxes, and that she contemplated making a trust and she wanted to know if I would advise with her about it"; that he advised her to consult her oldest son; that she never mentioned inheritance or estate taxes.

Arthur further testified that several days before December 19, 1934 his father spoke to him about the trust he was contemplating; that his father stated as follows: "I am minded to making some more because it is said they are going to hike up these gift taxes again and I want to make a living trust and I would like for you to be associated with the Empire Trust Company in the handling of it as co-trustee."

He also testified that prior to December 13, 1934, his father never told him that he knew of the contemplated trust by Mrs. Orvis and that his mother in her conversation with him never stated that she knew of her husband's trust.

Warner D. Orvis testified that his father spoke to him in the fall of 1934 about creating another trust; that his father in substance or effect did not tell him anything to show that he had knowledge that his wife was contemplating the creation of a trust which subsequently matured into the trust of December 13, 1934; that his mother never said anything to him prior to December

13, 1934 which would indicate that she had knowledge that her husband was contemplating the creation of a trust; that he [Warner] had informed her of that fact; that in November, 1934, his father spoke to him about creating a trust; that he spoke principally about making Arthur his trustee; that in November, 1934 his mother spoke to him about her intention to create a trust; that only he and his mother were present; that he suggested to his mother that inasmuch as her husband had been looking into the subject of trusts he should act for her to take care of the necessary details with the bank; that he advised his mother to consult Mr. Merritt who had been consulted by Mr. Orvis concerning the formation of a trust.

This witness further testified that his mother had adopted his suggestion and had consulted with her husband.

Mr. Merritt testified that Mr. Orvis never discussed with him any subject bearing upon the subject of cross or reciprocal trusts to be executed by Mrs. Orvis in connection with any of his trusts; that Mrs. Orvis, some time in November, 1934, first talked to him about her contemplated trust; that this conversation took place at the home of Mr. and Mrs. Ovis; that it was his recollection that he and Mrs. Orvis were alone when the talk about the trust took place and that she gave the following reasons for creating the trust: "She told me that she was worried over the economic and financial condition of the country and also as to some of the political aspects of the country; and that she and her husband wanted to go on travelling as they had been travelling theretofore, and she wanted to be free to do that and wanted the responsibility of taking care of some of her property to be taken off the shoulders of her husband and put on the shoulders of a bank and her son Homer Orvis—rather Warner Orvis—as co-trustee."

Mr. Merritt also testified concerning the 1934 trust created by Mr. Orvis. He stated that Mr. Orvis discussed the preparation of his trust about three or four days prior to December 19, 1934; that Mr. Orvis gave the following reasons for the formation of this trust: "Q. And what did he say, if anything, to you in that connection? A. He told me that he was disturbed and anxious about the political and economic and financial condition of the country, and that he had retired as an active partner and he and his wife were going to travel extensively and wanted to be free to come and go as they desired and that he wanted the responsibility of taking care of some part of his assets to be assumed by a bank and by one of his sons. He was particular to state that a son must be and would be a co-trustee, because he wanted the son to help share the responsibility of investigating and taking care of what would go under the trust"; that Mr. Orvis did not discuss with him anything bearing upon whether he was making his trust agreement in consideration of his wife's prior trust agreement of December 13.

As to the difference in the dates of the execution of the two trusts, Mr. Merritt testified that Mr. Orvis came to him two or three days prior to December 19 and said, "Now you drew up a trust for Mrs. Orvis and now I want you to draw a trust for me. I have decided I am going to make a trust with the Empire Trust Company. You prepare that. You can do it quickly for me. You have got the form from the Fifth Avenue Bank and that form ought to be satisfactory to the Empire Trust."

Homer Orvis testified that in 1934 his father stated that he was contemplating making a trust; that his mother was not present at the time; that he did not learn that his mother had made a trust until after it had been done.

The securities in the trust created by Mrs. Orvis were of the par value of $250,-000. Her husband was the life beneficiary and the principal was payable on the death of decedent to the surviving issue of the settlor.

In the Lehman case, supra, two brothers who owned equal shares in stocks and bonds, executed trust indentures for the benefit of each other, covering their respective shares. The transfers were made in consideration of each other. Withdrawal privileges to the extent of $150,-

000 were provided for in the indentures. The Court held that sum includible in decedent's gross estate for tax purposes: "The decisive point is that the decedent by transfer of his share to the brother or for the brother's use or according to the brother's direction caused the brother to make a transfer of property in trust under which the decedent had the right to withdraw $150,000 from principal. While section 302(d) speaks of a decedent having made a transfer of property with enjoyment subject to change by exercise of power to alter, amend or revoke in the decedent, it clearly covers a case where the decedent by paying a quid pro quo has caused another to make a transfer of property with enjoyment subject to change by exercise of such power by the decedent." [109 F.2d at page 100.]

In the present case, there is no evidence, except the mute circumstances, that the trusts were made in consideration of each other, or that the decedent "caused" Mrs. Orvis to make hers, or vice versa. On the contrary, Mr. Merritt and the sons testified that neither the decedent nor Mrs. Orvis ever indicated that the trusts were made on the basis of a relation to each other. The fact that increased gift taxes were in the process of enactment and that the decedent and Mrs. Orvis were upset by economic conditions, and wished to travel were all assigned as reasons for the creation of trusts. But no witness even intimated that the decedent acted with Mrs. Orvis' intentions in mind, or she with his, but rather the circumstances suggest that each pursued an independent course, except for such information that might have passed between them by reason of their relationship.

Under all the circumstances. I hold that the coincidental similarity of dates and terms is not sufficient to convince me that the Orvis's intended reciprocity in these trusts. The evidence of the plaintiffs persuades me there was not. Cf. Estate of Fish, 45 B.T.A. 120; Estate of Lindsey, 2 T.C. 174; Hanauer's Estate v. Commissioner, 2 Cir., 149 F.2d 857, certiorari denied 326 U.S. 770, 66 S.Ct. 175, 90 L.Ed. 465.

Judgment for plaintiffs as prayed for in the complaint.

If the parties are unable to agree as to the exact amount of the recovery, I will fix a time when they may appear before me to argue the point.